No. 34,717

FRED DEGNAN, *Appellee*, v. YOUNG BROTHERS CATTLE COMPANY,
*Appellant*.

(103 P. 2d 918)

Opinion filed July 6, 1940.

*Francis C. Price, Floyd N. Cossman* and *Herbert R. Daigh,* all of Ashland, for the appellant.

*Robert C. Mayse,* of Ashland, and *Carl Van Riper,* of Dodge City, for the appellee.

The opinion of the court was delivered by

SMITH, J.: This is an action to recover damages for breach of an oral contract for the pasture of cattle. Judgment was for the plaintiff. Defendant appeals.

The amended petition, upon which the case was tried, alleged that defendant, a Missouri corporation, owned a ranch of about 15,000 acres in Clark county; that one Charles Chadwick for several years had been the manager thereof and was defendant's duly authorized agent in all matters pertaining to its management and operation; that one part of this ranch consisted of 2,200 acres of pasture, known as the Hackberry pasture; that in November, 1936, plaintiff had a conversation with Chadwick in which it was agreed that defendant would take for pasture in the Hackberry pasture during the 1937 season from 100 to 150 head of plaintiff's cattle; that at another conversation about the first week in February, 1937, Chadwick informed plaintiff he wanted only about 125 cows in that pasture; that plaintiff informed him that he had about 100 to 110 grown cattle and about 40 yearlings, equivalent to 125 cows, and Chadwick informed plaintiff that it would be all right to put them in the Hackberry pasture for that season; that about the second week of February plaintiff told Chadwick he would like to move his cattle to Hackberry about April 1, and was informed by Chadwick that he could not put his cattle in that pasture and that defendant refused to carry out the contract as set out; that plaintiff made exhaustive effort to get another pasture, but failed; that plaintiff had a pasture at his home of about 1,000 acres, but planned to pasture therein 51 yearling steers, which he owned, in addition to the 40 other yearlings and the 100 to 110 grown cattle which he had intended to place in the Hackberry pasture; that he could not obtain any other pasture and was forced to dispose of all his cattle except such as his home pasture would accommodate; that he selected from his entire holdings those he could pasture at home and sold that portion which would be least profitable to hold through the grazing season; that instead of holding the 51 yearling steers, as planned, he selected and held in his home pasture throughout the summer some of the cows he had agreed and intended to put in Hackberry and was compelled to sell the remainder; that on April 5 he sold 51 yearling steers, on April 9, 35 yearling heifers, and on April 12, 15 head two-year-old heifers, 17 head grown cattle and 10 calves. The petition then alleged that if plaintiff had been permitted to pasture his cattle in Hackberry plaintiff would have kept all his cattle, which were so sold, and would have received the increase in their value during the pasture season of 1937, and they would have been worth the following amounts: The 51 yearling steers

$3,396.17, the 35 yearling heifers $2,194.37, and the 42 head mixed cattle $2,887.04; that it would have cost plaintiff to pasture the cattle he was compelled to sell $364.50, leaving a net amount from the value of said cattle in the fall of $8,113.08, or $2,945.75 more than they were worth when he sold them, and that plaintiff was damaged in that amount.

The prayer was for $2,945.75.

After various motions to strike had been filed by the defendant and overruled a general denial was filed and the case was submitted to a jury. Verdict was rendered for the plaintiff in the amount of $1,200. Motions for a new trial and to set aside answers to special questions were filed and denied and judgment was entered for plaintiff. Hence this appeal.

Because various errors urged by the defendant require consideration of the evidence offered, the evidence on each point will be discussed as that point is considered.

The first argument made by the defendant turns upon the question of the agency of Chadwick. The action is brought upon the theory that defendant permitted Chadwick to act as though he were the agent of defendant and hence defendant was estopped to deny such agency to the injury of a third party, who, relying upon the apparent agency, in good faith and without negligence, dealt with such agent.

Defendant concedes the above to be the rule, but argues that the evidence disclosed that plaintiff did not in good faith and without negligence rely upon Chadwick's apparent agency.

A discussion of this argument requires us to examine somewhat the course of dealing had between the parties for some years prior to the events that are the basis of this suit. Plaintiff had been a member of a partnership, which was known as Mrs. F. H. Degnan and Sons and Fred Degnan. This partnership owned a ranch which adjoined the Hackberry pasture.

It was to the firm that Hackberry pasture was let for the year 1937. Usually the business transactions between defendant and the firm were carried on for the firm by Henry Degnan. Defendant points out these facts and argues that they compel a conclusion that plaintiff did not in good faith rely upon the contract pleaded. We cannot agree with that conclusion. In the first place, the evidence does not bear out the statement that negotiations were carried on mostly between Henry Degnan and defendant. There is a letter in

the record written to plaintiff, in the year 1932 by Mr. Young, manager of defendant, in which he stated, among other things:

"Our custom has been, as you no doubt know, and as Charley has told you, to change the pasture rate when the owner commences feeding his cattle."

There was testimony by all parties that pasture contracts were not entered into in writing and were not usually confirmed by letter. There is evidence that Chadwick knew that plaintiff had withdrawn from the partnership, since he was present the day the cattle of the partnership were divided. The question was submitted to the jury under proper instructions on this point, which found the facts in favor of the plaintiff. We cannot say that there was no substantial evidence to sustain the findings. There is evidence in this record to the effect that plaintiff's ranch was divided into five or six different pastures, and during the long course of dealings between plaintiff and defendant, plaintiff and the partnership had used every one of these pastures at one time or another. A conclusion from these facts that plaintiff did not in good faith rely on the apparent agency of Chadwick would be an unreasonable one.

The next question argued by defendant is that the evidence does not show there was a completed contract. Plaintiff testified to three conversations in this record. One occurred about the first week of November of 1936 on the day plaintiff had separated his cattle from the cattle owned by the firm. The testimony was as follows:

"Q. What was that conversation? A. Well, I told Charley I was moving home for the winter to shape up my herd, probably sell off more or less, when I got through my herd would likely fit the Hackberry pasture, and wanted to know what chance I had of coming back, and he said, 'Very good.'"

The next conversation occurred about the first week in February of 1937 in front of a bank in Ashland. It was as follows:

"Q. And will you relate that conversation? A. Well, I told him I would like to renew the conversation concerning Hackberry, what they wanted. He said they just wanted about 125 cows in there that season. I said, 'Well, Charley, here is what I have got. I could put in from 100 to 110 cows and bulls and about 40 yearling heifers, don't you think that would be about equivalent to 125 cows?' And he said, 'Yes, it would.' 'Now,' I said, 'I will depend on it then,' and he said, 'All right,' and we left one another."

The next conversation occurred about the second week in March on a street in Ashland. It was as follows:

"Q. What was that conversation? A. I told Charley that my landlord demanded I move off the wheat the first of April and that I would like to

move off the wheat the first of April and that I would like to move into Hackberry at that time and cake and straw on up until grass, feeding there loose on—

"Q. That would be the first of April? A. Fifteenth—first of April when I wanted to move in, yes.

"Q. Go on, state the rest of the conversation, what did he say, you say? A. He turned around, 'Who the hell said you was going to get Hackberry?' I said, 'You did, over in front of the Citizens Bank a month ago.'

"Q. Go ahead, say what he said without saying what effect it had on you. A. I said, 'Charley, you leased this pasture to me over in front of the bank, you know that.'

"Q. Just state what was said. A. Well, he said, further, 'it is the Boss' idea that the less heads you deal with the less trouble you have, and we let your brother and mother have it.'"

The defendant argues that in these conversations nothing was said about the price per head that plaintiff was to pay, and hence that item of the contract was not agreed upon, and that nothing was said as to the time the pasture was to be available, hence that item was not agreed upon. The defendant also points out a discrepancy in the testimony of plaintiff, since he testified that the pasture bill on the cattle he sold would amount to $364.50, whereas according to his testimony as to what the pasture would be worth had he used it for six months, the pasture bill would have been $615. Defendant argues on this account its motion for an instructed verdict should have been sustained and defendant's motion to set aside the verdict of the jury and for a new trial should have been sustained.

It is the position of the plaintiff that the plaintiff and defendant had been making contracts for the pasture of cattle for many years; that it was the custom for cattle to be supplied by defendant without a specified agreement as to what the price would be and as to how long they would be in the pasture. Mr. Young, manager of the company, testified the contract for pasture would not always specify what the price was to be and that it was frequently left until the fall and the whole matter adjusted at that time, both as to the price and the length of time the cattle were to be in the pasture. The plaintiff in this case had a right to believe that the same custom that had been followed between the Degnan firm and defendant would be followed between himself and defendant, and that the custom that has been referred to was a part of the contract as much as though it had been agreed to in terms. In *Rains v. Weiler,* 101 Kan. 294, 166 Pac. 235, this court said:

"Parties may be as firmly bound by implied contracts as by those expressed

in words, oral or written; they may arrive at agreements, by acts and conduct which evince a mutual intention to contract and from which the law implies a contract." (Syl. ¶ 1.)

This court quoted from 1 Addison on Contracts, 8th ed., p. 54, as follows:

" 'The intention of the parties to any particular transaction may, however, be gathered from their acts and deeds, in connection with the surrounding circumstances, as well as from their words; and the law therefore implies, from the silent language of men's conduct and actions, contracts and promises as forcible and binding as those that are made by express words or through the medium of written memorials.' " (p. 297.)

The next argument made by defendants is that evidence was admitted as to the elements of damage which were speculative and remote and not within the contemplation of the parties. What defendant refers to under that head is that evidence was admitted on the part of the plaintiff not only as to the difference in weight of the cattle when he was compelled to sell them in the spring, and what they would have weighed in the fall, had he kept them, but also as to the difference in price in the spring and in the fall, in each case the price being higher in the fall than in the spring. Defendant makes the statement that it is common knowledge among those engaged in the cattle business that the only object contemplated by the parties to a contract to pasture cattle through the grazing season is the growth of the cattle and their increase in weight, and not with the view of holding them over, dependent upon the future state of the market. The record shows that plaintiff sold some steers on the 5th of April; that their average weight was 558 pounds; that he sold some heifers on April 9 and their average weight was 512 pounds; that the steers sold for $7.85 per hundred, and the heifers for $7 per hundred and that there were nine cows, eight of which weighed a total of 9,150 pounds. He also testified as to what, in his opinion, these cattle would have weighed, and what they would have been worth had he kept them all summer as he planned to. There was other evidence to corroborate this testimony. The testimony as to the judgment of plaintiff was not disputed. In 8 R. C. L. 505 the following rule is laid down:

"A recovery may be had for the loss of profits which are the direct and immediate fruits of the contract itself. Such profits are not to be regarded as consequential, remote or speculative in character, but are regarded as part and parcel of the contract itself, entering into and constituting a portion of its very elements, something stipulated for, and the right to the enjoyment of which is just as clear and plain as to the fulfillment of any other stipulation."

The rule contended for by defendant applies to such damages as are not the certain result of the breach and not to damages which are certain of result but uncertain in amount. (See 17 C. J. 756.) It cannot be said that one pasturing cattle all summer does not contemplate that the price of these cattle will be higher in the fall as well as contemplating that they will be heavier. The increase in price is one of the elements of profit upon which the industry depends. (See *Brown v. Hadley*, 43 Kan. 267, also *Gas Co. v. Bailey*, 77 Kan. 296, 94 Pac. 258.)

The next point argued by defendant is that the allegation of plaintiff that he sold cattle which he thought would be less profitable to hold all summer, and kept the ones that he thought would be most profitable, in mitigation of damages, was not supported by the evidence. In this connection defendant points out that while plaintiff did testify as to what would have been the gain in weight and the gain in price of the cattle he sold, he did not point out that the cattle he did not sell, but which he had intended to put in the Hackberry pasture, would have gained less or been worth less. It is true that the plaintiff did not testify as to the above in detail. He did, however, testify that from his experience as a cattleman it was his judgment that there would have been less profit in keeping the fifty-one steers than the cows. This testimony was offered without objection. He was not cross-examined upon it and no evidence was offered to dispute it. Under the circumstances about all he could do was use his judgment, and he testified that he did that. That was sufficient to sustain the allegations of the petition.

In connection with this argument the defendant challenges the correctness of instruction No. 7. This instruction was as follows:

"It is the claim of the plaintiff that when defendant refused to accept his cattle for pasture he was unable to find other pasture and it became necessary to sell certain of his cattle; that he selected from his herd those animals which he thought would return the least profit if continued on pasture during the 1937 season. In this connection you are instructed when the plaintiff learned that defendant would not receive his cattle it was his duty to mitigate his damage by making reasonably diligent effort to obtain other pasture, and, if he could not obtain other pasture, to dispose of his excess cattle. He was not compelled to dispose of the identical cattle which he had intended to run in the defendant's pasture, but he had the right to select from his entire herd those animals which he considered would be least profitable to run on pasture during the 1937 season; and the burden is on the plaintiff to show that he selected and sold animals which would be least profitable to run on pasture, and exercised reasonable diligence to find other pasture for his cattle."

The objection defendant makes to this instruction is that the court used the words "considered" and "thought" in speaking of what the plaintiff was bound to do to mitigate his damage. We cannot see why the use of these words rendered the instruction bad. This is but another way of stating that the plaintiff was to exercise his judgment in picking out what cattle he would sell and what cattle he would keep. There is no evidence in this record that he did not act in good faith in picking out these cattle.

The next question argued by defendant is that the record does not show that plaintiff exercised due diligence in his search for other pasture upon which he could run his cattle. In this connection the plaintiff testified that he did make an effort to find pasture that would be suitable for his cattle and stated the number of owners upon whom he called and from whom he solicited pasture. There is a dispute in the record as to just what plaintiff did with reference to one or two of these pasture owners, and as to what these owners said, but a special question was submitted to the jury, and answered as follows:

"Do you find that the plaintiff, Fred Degnan, with reasonable diligence, could have procured other pasture for the season of 1937, for about 125 head of grown cattle? A. No."

It would add very little to this opinion to set out in detail just what the evidence was on this point, but suffice it to say there was evidence to justify the jury in answering the question as it was answered.

The next point argued by defendant is that the court erred in giving instructions and in refusing certain instructions. The first instruction to which the defendant refers in this argument is No. 4. In that instruction the court stated that it was not necessary that all the terms of the contract be expressed, but some of them might be inferred or implied from custom and usage of the cattle business. Defendant argues there was no evidence at all on which to base this instruction on custom and usage, but we cannot agree with this argument. We cannot agree with that statement. There is ample evidence in this record offered by both parties to warrant giving an instruction on custom and usage.

The next instruction on which defendant claims error is No. 6. Defendant argues that this instruction is framed so that it would appear that the jury was told as a matter of law that Chadwick was the agent of the defendant. We cannot find that this instruc-

tion can be reasonably so construed. The instruction submitted the question of the agency to the jury and stated that the fact that Chadwick was foreman was not itself sufficient for him to make pasture contracts. The rule was then stated as to a party being held out by his principal as an agent and a third party relying on it. We find nothing wrong with this instruction.

Appellant next argues that instruction No. 9 should not have been given because it was wholly inconsistent with the plaintiff's theory of the case. In this instruction the jury was told that if no definite amount was agreed upon by the parties then plaintiff would be bound "to pay them the fair and reasonable value" of the pasture, and the jury was instructed that they should allow the defendant actual value of the pasture from all the evidence in the case. We cannot see where defendant was prejudiced by the giving of this instruction, because the evidence as to the value of the pasture is not disputed and there is no dispute as to the amount which plaintiff allowed defendant as the value of the pasture in testifying as to his damages. We have examined the instructions which were requested by the defendant and find that the matters covered by these requested instructions were all covered by the instructions given.

Plaintiff next argues that the court erred in excluding two letters that were written by Mr. Young to Mr. Chadwick, one under date of October, 1931, and the other in November, 1931. These letters were never brought to the attention of the plaintiff and there is no evidence at all that he ever saw them. Defendant argues that they should have been admitted because they tended to corroborate matters stated in the letters written by Mr. Young to the plaintiff along about the same time. We have examined these letters and are unable to find where they would have shed any light on the matters at issue in this case. The defendant was not prejudiced by their being excluded.

The next point argued by the defendant is that the court allowed interest on the verdict from the date it was returned instead of from the date of judgment. His argument is that since this was an unliquidated claim the interest should not have been allowed from the date judgment was entered. The trouble with this argument is that under the terms of G. S. 1935, 60-3117, it was the duty of the clerk of the court to enter judgment upon the verdict when it was returned. This was the correct procedure. This interest was

allowed under the authority of the above statute and *Koontz v. Weide,* 111 Kan. 709, 208 Pac. 651. It was not error for the court to allow it.

The judgment of the trial court is affirmed.

HARVEY, J., not sitting.