Atcheson, J.,
concurring: Although the majority reaches tire correct result here, I fail to see this as a case dependent upon contracts implied in fact. The evidence actually shows that Defendant Murray & Sons Construction Co. accepted tire terms of the written contracts Plaintiff Lindsey Masonry Co. offered in its proposals to work as a subcontractor on the school projects. Accordingly, Murray & Sons was bound to those contracts and the other terms of tire proposals. Based on tire trial record and the parties’ representations on appeal, I do not understand the relief tíre Johnson County District Court granted under the implied contracts to be different from what Lindsey would have received under its proposed contracts that really governed. I, therefore, concur in affirming the district court judgment entered against Murray & Sons. But the district court and the majority misapply the doctrine of implied-in-fact contracts to these commercial transactions between sophisticated business entities.
Each of these major construction projects for the Blue Valley School District got off to a similar start for Lindsey and Murray & Sons. On each project, Murray & Sons intended to bid the job as the general contractor and invited a proposal from Lindsey to perform the masonry work. Lindsey submitted a written proposal to Murray & Sons for each job outlining the scope of the work it would do, a dollar amount it would be paid, and other terms under *529 which it would perform. The proposals stated that if they were accepted by Murray & Sons, “the parties will enter into an AIA Document A-401 Standard Form of Agreement,” as modified in several specifically identified ways.
As is common with government projects, the bids were opened and reviewed at a public meeting. In each instance, Murray & Sons submitted the lowest acceptable bid to act as general contractor. The school district then awarded the construction contract to Murray & Sons. Gene Murray, the principal of the company, called Jon R. Lindsey, his counterpart at Lindsey, the same day to say Murray & Sons had been given the contract. The trial evidence shows that for each job Gene Murray told Jon Lindsey that Murray & Sons would subcontract the masonry work to Lindsey as outlined in Lindseys proposal. Gene Murray neither indicated the proposal to be unacceptable in any of its particulars nor suggested some negotiation of tire proposed terms would be necessary. The district court made factual findings that during every one of those calls, Gene Murray informed Lindsey the masomy proposal for the particular project “had been accepted.” Typically within a day or so, Jon Lindsey faxed a brief letter to Gene Murray acknowledging the acceptance of Lindseys proposal and expressing his expectation for a mutually rewarding business relationship. Gene Murray never responded to those letters in a way suggesting material terms of that business relationship had yet to be resolved.
Later, Lindsey sent Murray & Sons a signed written contract conforming to the modified version of AIA Document A-401 described in the proposal. Murray & Sons responded by sending Lindsey a different form contract drafted by the Associated General Contractors of Kansas. Neither party signed the others contract. Lindsey began work on the respective projects, and Murray & Sons started making periodic payments to Lindsey for its work.
As recounted in the majority opinion, the work relationship between the two companies deteriorated and eventually broke out in full-scale litigation. The district court had to sort out the legal relationship between the companies with respect to the four projects. Although neither Lindsey nor Murray & Sons argued they had implied-in-fact contracts on any of the jobs, the district court *530 latched on to that theory to establish limited terms and conditions governing their business dealings. The majority goes along. That exercise seems unnecessary and inappropriate. Implied-in-fact contracts entail a somewhat exotic variation on the usual pattern of contract formation. The trial evidence, however, comfortably fits the usual pattern, so there is no need to resort to legal exotica.
In the common scheme, a contract consists of an offer by one party to perform a service or to supply an object in exchange for something of value, typically money, followed by an acceptance of that offer from another party. M West, Inc. v. Oak Park Mall, 44 Kan. App. 2d 35, 49, 234 P.3d 833 (2010) (noting that offer, acceptance, and consideration constitute “all the components of a valid contract”). Thus, for example, a high schooler may ask to mow a homeowner’s lawn for $30. That’s an offer. The homeowner may reply, “Okay, be here next Tuesday.” That’s an acceptance. The two now have a contract. The mutual promises—to mow on Tuesday and to pay $30—provide tire consideration necessary to support the contract. Peoples Exchange Bank v. Miller, 139 Kan. 3, 7, 29 P.2d 1079 (1934) (exchange of promises of future performances provide consideration for bilateral contract); Barker v. Kansas Dept. of Labor, No. 114,199, 2016 WL 3202698, at *3 (Kan. App. 2016) (unpublished opinion) (each mutually agreed-upon promise of performance provides consideration for the other resulting in a bilateral contract). The parties, of course, may bargain before agreeing on an exchange of promises. They may dicker over price or tire manner of performance. The homeowner might offer to pay $25 for the lawn mowing. The high schooler could counteroffer to mow the lawn and trim the hedges for $35, and if the homeowner agrees, those are the mutual promises forming the contract.
Here, Lindsey offered to perform masonry work for Murray & Sons on each of the construction projects in exchange for Murray & Sons’ promise to pay a specified amount and otherwise abide by the terms and conditions in the proposal. So if Murray & Sons accepted a proposal, the company thereby entered into a bilateral contract with Lindsey the provisions of which conformed to that proposal.
A party accepts an offer through an objective manifestation of *531 assent or agreement to the offer. Southwest & Assocs., Inc. v. Steven Enterprises, 32 Kan. App. 2d 778, Syl. ¶ 2, 88 P.3d 1246 (2004). Unless an offer requires acceptance be given in a certain way, no particular words or acts are necessary as long as the offeree’s overt agreement is apparent. An oral acceptance of a written offer, therefore, is sufficient. Fey v. Loose-Wiles Biscuit Co., 147 Kan. 31, 35, 75 P.2d 810 (1938); see Hartford Fire Ins. Co. v. P & H Cattle Co., Inc., 451 F. Supp. 2d 1262, 1273 (D. Kan. 2006). Likewise, an of-ferees subjective, uncommunicated intent makes no difference— all that is required and all that counts is outward assent. Andra v. Peebler Rev. Trust, No. 106,432, 2012 WL 4937465, at *7 (Kan. App. 2012), rev. denied 298 Kan. 1201 (2013) (A party manifesting assent to an offer creates a contract “even if that party believes he or she may later renounce the agreement with impunity or harbors an unstated intent not to be bound.”); 1 Corbin on Contracts § 4.10, p. 619 (rev. ed. 1993).
Although an oral acceptance may be legally sufficient, it is evanescent and, thus, open to being disputed in ways an offeree’s signature on a written contract cannot. But those disputes bear on proof of the acceptance, not its legal import once proved. Here, as I have said, the district court sitting as the finder of fact expressly determined that Gene Murray orally accepted without qualification or reservation Lindseys proposals for the masonry work on each of the four projects. And those findings are supported by substantial competent evidence. See K.S.A. 2015 Supp. 60-252(a)(l) and (5) (In an action tried to the district court, its factual findings “must not be set aside unless clearly erroneous[.]”). The upshot is that Lindsey and Murray & Sons entered into contracts for the masonry work on those projects that conformed to the terms set out in Lindseys proposals, including the modified AIA Document A-401 Standard Form of Agreement. Those contracts controlled the companies’ legal relationship and the dispute we have before us.
Gene Murray’s refusal to sign the AIA documents Lindsey later forwarded amounts to a legal irrelevancy, since the companies had already offered and accepted those terms to form binding contracts. Notwithstanding its own factual findings, the district court mistakenly concluded there had been no formal acceptance of an *532 offer because neither side could produce a written contract signed by the other. The conclusion, however, misperceives what is required for a valid acceptance. The district court had no need to go in search of some implied-in-fact contracts to establish the terms of the legal relationships between Murray & Sons and Lindsey on the projects or to resolve their legal dispute over those projects.
But so far as I can tell from the record, the district court’s error makes no practical difference in this case, since Lindsey would receive essentially the same relief under the actual contracts the parties entered into for tire projects. During oral argument, tire lawyers did not identify any way Lindsey would have gotten more (or less) in a judgment based on the terms of the modified AIA agreement.
The real problem here lies in the idea that the doctrine of implied-in-fact contracts ought to be deployed when the parties actually have engaged in the readily identifiable steps necessary to form a traditional contract or when the parties are presumptively sophisticated business entities undertaking a multifaceted commercial deal. Courts may find implied-in-fact contracts when the overall circumstances indicate tire parties intended to be bound to certain mutual obligations but have not formally exchanged discrete offers or acceptances. The terms of their contractual relationship must be discerned from their general communications and tire pattern of their interactions. See Atchison County Farmers Union Co-op Ass’n v. Turnbull, 241 Kan. 357, 363, 736 P.2d 917 (1987) (“Contracts implied in fact are inferred from the facts and circumstances of the case and are not formally and explicitly stated in words.”); Degnan v. Young Bros. Cattle Co., 152 Kan. 250, 255, 103 P.2d 918 (1940) (Parties “‘may arrive at agreements, by acts and conduct which evince a mutual intention to contract and from which the law implies a contract.’”) (quoting Rains v. Weiler, 101 Kan. 294, Syl. ¶ 1, 166 P. 235 [1917]); 17 C.J.S., Contracts § 6, p. 391 (“[A]n implied-in-fact contract is founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from the conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding.”). Judicial recognition of implied-in-fact contracts necessarily *533 entails an amorphous exercise requiring interpretation of parties’ inexact signals to arrive at sufficiently definite rights and duties to bind those parties to a legally enforceable agreement. In its written decision, the district court alluded to precisely that difficulty in trying to piece together the specific terms of the contracts it sought to imply in fact.
Implied-in-fact contracts, then, function as a convention to impose some legal structure upon arrangements parties have left unstructured either because they have failed to appreciate the utility that structure might provide if their relationship does not go as planned or because they consider their arrangements so straightforward they have no need to fully articulate the terms. To be sure, implied contracts serve an entirely beneficial purpose in sorting out legal relationships between parties taking a casual or unsophisticated approach to their mutual transactions and in resolving their disputes about rights and duties arising from comparatively simple transactions.
But the convention ought to be cautiously invoked to find enforceable agreements governing complex transactions when the parties have engaged in recognizable steps toward making a formal contract. If tiróse steps have not yielded an identifiable contract, then tire parties likely have not entered into an enforceable agreement. (Here, of course, they did, as I have outlined.) To be binding, a contract typically must address all material terms and conditions related to tire transaction. Dougan v. Rossville Drainage Dist., 270 Kan. 468, 488, 15 P.3d 338 (2000) (“to form a binding contract, there must be a meeting of the minds as to all essential terms”); see Ekedahl v. COREStaff, Inc., 183 F.3d 855, 858 (D.C. Cir. 1999); 17 C.J.S., Contracts § 78, p. 485 (“[W]here the parties fail to agree to all the material terms, no contract is formed even if the parties intended to be bound . . . .”). And courts typically cannot make contracts for the parties by imposing essential terms that the parties themselves have failed to agree upon. See Fourth Nat’l Bank & Trust Co. v. Mobil Oil Corp., 224 Kan. 347, 353, 582 P.2d 236 (1978) (“It is not the function of tire courts to make contracts but to enforce them.”); Bank of the Ozarks, Inc. v. Walker, 2014 Ark. 223, at *5, 434 S.W.3d 357 (2014). With intricate commercial *534 transactions, a court attempting to imply in fact a contract from the parties’ conduct will, more likely than not, wind up either creating at least some material terms that the parties never mutually accepted or omitting entirely what reasonably would be considered essential terms for a formal contract. Either way, the court would flout accepted legal principles in tire guise of “implying” a contract.
This case appears to be an example of the latter failing. Lindsey quoted a price of more than $1,000,000 for the masonry work on three of the four projects. The district court concluded the implied-in-fact contract for each consisted simply of the description of work outlined in Lindseys proposal and the quoted price. It seems improbable that experienced contractors would find those provisions alone to be the only terms and conditions essential for a contract covering work of that scope and value. Indeed, tire detailed written contracts Lindsey and Murray & Sons exchanged belie that premise. In turn, the notion they actually agreed to such a spare arrangement through their actions similarly seems more the product of a legal fiction than a genuine implied-in-fact contract. [*]
[°] Even absent a formal contract or one implied in fact, a party conferring a benefit on another party may be equitably entitled to compensation for the fair value of the benefit. See Haz-Mat Response, Inc. v. Certified Waste Services Ltd., 259 Kan. 166, Syl. ¶ 6, 910 P.2d 839 (1996) (quantum meruit or unjust enrichment); Bouton v. Byers, 50 Kan. App. 2d 34, 41, 321 P.3d 780 (2014) (promissory estoppel), rev. denied 301 Kan. 1045 (2015). If the parties had failed to enter into a contract for any of the projects, Lindsey would have had an equitable claim for some compensation. In this action, Lindsey asserted alternative claims based on promissory estoppel and quantum meruit.
In short, Murray & Sons accepted the offers made by Lindsey in the proposals it submitted for the masonry work on the four projects. Those proposals included the AIA contract, as modified, so those terms and conditions became part of the bargain to which Murray & Sons agreed. The parties, therefore, had formal contracts that governed each of the projects disputed in this case. The doctrine of implied-in-fact contracts had no place here. I, nonetheless, *535 concur in affirming the judgment for Lindsey because substituting doubtful implied-in-fact contracts for the formal contracts the parties actually entered into did not alter the appropriate relief—a wholly fortuitous turn that should not detract from that misapplication of contract law.