No. 55,469

Carol M. McGuire, *Appellee/Cross-Appellant,* v. Earl C. Sifers, M.D., *et al., Appellants/Cross-Appellees,* v. Fletcher Bell, Commissioner of Insurance, As Administrator of the Health Care Stabilization Fund, *Intervenor.*

(681 P.2d 1025)

Opinion filed April 27, 1984.

*M. Warren McCamish,* of Williamson & Cubbison, of Kansas City, argued the cause, and *John L. Peterson* and *Timothy P. McCarthy,* of the same firm, were with him on the brief for the appellants/cross-appellees.

*Jay Thomas,* of Barnett & Ross, Chartered, of Kansas City, argued the cause, and *James M. Barnett,* of the same firm, was with him on the brief for the appellee/cross-appellant.

*Michael J. Dutton,* special assistant attorney general, argued the cause and was on the brief for intervenor Fletcher Bell, as Administrator of the Health Care Stabilization Fund.

The opinion of the court was delivered by

LOCKETT, J.: This is a direct appeal of a medical malpractice action instituted by Carol M. McGuire against Earl C. Sifers, M.D. and Sifers, Taylor and Hitchcock, M.D.'s, Chartered, a professional corporation. Count I claims damages suffered by McGuire (plaintiff). Count II claims damages for loss of consortium pursuant to K.S.A. 23-205. The case was tried before a jury in November, 1982. The jury returned a verdict for $600,000.00 in Count I and $82,000.00 in Count II. The trial judge reduced both Count I and Count II by the 35% fault attributed to the plaintiff by the jury. The final judgment totaled $443,300.00. The defendants appeal. Plaintiff cross-appeals. Insurance Commissioner Fletcher Bell, as Administrator of the Kansas Health Care Stabilization Fund (Fund), was permitted to intervene.

In January, 1976, McGuire was referred by her family physician to Dr. Sifers, a surgeon, for monitoring and observation of several lumps in her breast. McGuire's condition was diagnosed

as fibrocystic disease, a forming of cysts in the breast tissue. Biopsies were taken to aid in determining whether the cysts were harmless, premalignant or cancerous. To treat the fibrocystic disease, Dr. Sifers performed subcutaneous mastectomy surgery upon the plaintiff in May, 1979. Dr. Sifers' primary objective in performing the surgery was to prevent the possibility of the plaintiff developing breast cancer later. During the plaintiff's operation, Dr. Sifers removed breast tissue from between the muscle and skin, and silicone gel implants were inserted to reconstruct the breast. Approximately 20% of the breast tissue was not removed by Dr. Sifers to permit possible further breast reconstruction at a future time.

Complications arose after the plaintiff's surgery. The nipple areas grew dark and hardened; the skin died and pulled away from the breast. Surgery was performed by Dr. Sifers in August, 1979, to remove those areas of dead skin and to close the wound. Dr. Sifers removed the stitches several weeks later. The day Dr. Sifers removed McGuire's stitches, the incision opened and required restitching at an emergency room. From August to November, 1979, the plaintiff's stitches in the breast area reopened requiring restitching three or four times. When the incisions broke open, implants were visible. Where the stitches failed, openings were sometimes two or three inches wide.

In an effort to solve the problem Dr. Sifers removed the breast implants in November, 1979, and placed smaller implants in the breasts. For a three to four month period the plaintiff began to feel better and all incisions remained closed. Since her first operation the plaintiff had been confined to bed; she was now allowed to get up and take over household chores.

Troubles began anew in March, 1980, when the incision on the right breast opened. Dr. Sifers repeatedly performed corrective surgery. The incisions continually broke open between March and May, 1980. In May, 1980, Dr. Sifers again replaced one of the implants with a smaller implant. In the new implant area the incision opened frequently between May and August, 1980. Both breast implants were removed in August, 1980, by Dr. Sifers. The plaintiff, still in pain, consulted another doctor in August, 1980. In December, 1980, after office treatment and surgery performed by the second doctor, the plaintiff recovered. McGuire has not yet determined whether complete breast reconstruction surgery should be attempted.

At trial the plaintiff introduced expert witness testimony to prove Dr. Sifers treated the plaintiff in a medically negligent manner before, during and after surgery. The jury found for the plaintiff on November 24, 1982. The jury apportioned 65% of the fault to Dr. Sifers and 35% to the plaintiff. The trial judge reduced the judgment in both Count 1 and Count 2 by 35%. the judgment totaled $443,300.00. The defendants appeal. Plaintiff cross-appeals. The Insurance Commissioner, representing the Fund, was allowed to intervene in the appeal.

The first issue involves the admission into evidence of a portion of Dr. Sifers' testimony. During the presentation of plaintiff's evidence, Dr. Sifers was called as a witness.

The defendants contend reports of the Hospital Quality Assurance Committee introduced through Dr. Sifers' testimony was irrelevant and erroneously admitted since these events occurred after the plaintiff's surgery. From the transcript of Dr. Sifers' testimony, it is not clear which events occurred before or after the plaintiff's surgery. Dr. Sifers, in his answers to questions propounded by plaintiff's counsel, interjected into evidence the matters which his counsel now claims as error. Just prior to that testimony, Dr. Sifers asked his attorney if he should answer the question. Defendants' counsel urged him to answer. The defendants' counsel did then object to the relevancy of a portion of the doctor's testimony concerning matters subsequent to the plaintiff's surgery.

Relevant evidence is evidence having any tendency in reason to prove any material fact and the determination of relevancy is a matter of logic and experience, not a matter of law. *State v. Norman*, 232 Kan. 102, Syl. ¶ 4, 652 P.2d 683 (1982). Subject to certain exclusionary rules, the admission of evidence lies within the sound discretion of the trial court. *State v. Norman*, 232 Kan. at 108. Some of the matters contained within Dr. Sifers' testimony were events that occurred prior to plaintiff's surgery. At the time of trial, defendants failed to object that specific events occurred after the surgery. Without specific objections, the admission of evidence is generally not reversible error. See *State v. Garcia*, 233 Kan. 589, Syl. ¶ 7, 664 P.2d 1343 (1983).

The defendants did object to the admission of Bethany Medical Center documents promulgated in June of 1981, subsequent

to plaintiff's operation, which set restrictions on the performance of subcutaneous mastectomy surgery. It was Dr. Sifers who, while testifying at the trial, produced the documents from his briefcase; he then stated he had been using similar standards contained within the papers since 1971. Dr. Sifers' own testimony established the relevancy of these documents after he had voluntarily produced the documents.

The plaintiff claims if error was committed by admission of the evidence, it was harmless in the face of expert testimony. In addition defendants fail to show how the testimony prejudiced them. K.S.A. 60-261 provides:

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

Here it was Dr. Sifers who actually inserted into evidence the statement defense counsel claims as error. His client endeavored at trial to justify his past actions by implying his course of conduct in 1979 has been adopted as the proper standard for procedures in 1982. Despite defendants' attorney's objections urging the judge to require his client to stop testifying, the doctor continued to defend his prior actions. Defendants now claim that evidence was not relevant and it was error to admit the evidence. It was the defendant himself who proceeded in a manner which required the trial judge to admit the evidence. Where a party procures a court to proceed in a particular way thereby inviting a particular ruling, that party is precluded from assailing such proceeding and ruling on appellate review. *Grimm v. Pallesen,* 215 Kan. 660, 527 P.2d 978 (1974). The trial court did not err in admitting the evidence.

Defendants contend the evidence did not support the amount of the verdict. They contend the $600,000.00 the jury awarded to the plaintiff, before reduction for plaintiff's comparative fault, should shock the conscience of this court. The defendants cite the case of *Kirk v. Beachner Constuction Co., Inc.,* 214 Kan. 733, Syl. ¶ 1, 522 P.2d 176 (1974), where this court stated:

"Where the charge of excessive verdict is based on the passion or prejudice of the jury and depends for support solely on the size of the verdict, the trial court

will not be reversed for refusing a new trial, nor will a remittitur be ordered, unless the amount of the verdict in the light of the evidence shocks the conscience of the appellate court."

Defendants claim a large portion of the plaintiff's damages was compensation for past and future pain, suffering, disabilities, disfigurement and mental anguish. The plaintiff agrees with this assessment.

The court in *Kirk* also said at 214 Kan. 736-37:

"An examination of the numerous cases challenging the sufficiency, or insufficiency, of a verdict reveals no simple, symmetrical pattern or design. Each case seems to stand on its own facts. We deem it fruitless to attempt a reconciliation of the various amounts which have or have not been held excessive, and we shall undertake no such effort. Perhaps no better explanation can be given for the lack of dollars and cents uniformity in our decisions than is expressed in *Domann v. Pence,* 183 Kan. 135, 325 P.2d 321:

" '. . . Pain and suffering have no known dimensions, mathematical or financial. There is no exact relationship between money and physical or mental injury or suffering, and the various factors involved are not capable of proof in dollars and cents. For this very practical reason the only standard for evaluation is such amount as reasonable persons estimate to be fair compensation for the injuries suffered, and the law has entrusted the administration of this criterion to the impartial conscience and judgment of jurors, who may be expected to act reasonably, intelligently and in harmony with the evidence. . . .' (p. 141.)

. . . .

"The times in which we live are highly inflationary, with constantly climbing prices and a continually shrinking dollar. It is against this sort of a background that we must consider the dictates of conscience."

An appellate court should be cautious when requested to substitute its judgment for that of the trier of fact that heard the case. We cannot say, under these facts, the verdict is so excessive as to shock the conscience or indicate passion and prejudice on the part of the jury.

The defendant, Sifers, Taylor and Hitchcock, M.D.'s, Chartered, a professional corporation (Corporation), appeals from the denial of its motion for a directed verdict at the close of all the evidence. The Corporation contends it was not liable for Dr. Sifers' negligence under the doctrine of respondeat superior. The Corporation bases its argument upon the Kansas Health Care Provider Insurance Availability Act (Act). K.S.A. 40-3401 *et seq.* The Insurance Commissioner opposes the Corporation on this issue. The Act was examined by the court in *State ex rel. Schneider v. Liggett,* 223 Kan. 610, 611, 576 P.2d 221 (1978):

"The Kansas Health Care Provider Insurance Availability Act was passed by the 1976 legislature as a partial response to increasing pressure brought upon Kansas health care providers because of the national medical malpractice crisis. The primary feature of the act is the requirement that all health care providers operating within the state must obtain professional malpractice liability insurance (40-3402) and pay a surcharge to the health care stablilization fund (40-3404). The law requires the provider to carry a basic policy of $100,000 per occurrence and an annual aggregate of $300,000 for all claims made during the period. The stabilization fund provides for the payment of claims in excess of policy limits. Included in the act is a provision requiring every health care insurer to participate in an apportionment plan whereby any health care provider may obtain liability insurance from the plan if insurance from a conventional source (40-3413) is not available.

"The problem of obtaining and maintaining affordable malpractice insurance came before the legislature in 1971, 1973 and 1975. As a result, the legislature ·enacted a law in 1975 requiring all health care insurers to report their claims experience to the commissioner of insurance (K.S.A. 1975 Supp. 40-1126, et seq.). In 1976, however, the problem had grown to such proportions it received full legislative attention. A legislative interim committee was told in detail how insurance costs had skyrocketed on present policies, policies were unavailable for new doctors, insurers were beginning to withdraw from the medical malpractice field, and the availability of medical service in some Kansas communities was threatened. In response, the committee proposed twelve bills, including the act in the present controversy.

"The original bill did not require mandatory insurance coverage, nor did it require payment of the surcharge. These provisions were added by the legislature at the behest of Insurance Commissioner Fletcher Bell. The mandatory coverage provision, it was alleged, would provide for the financial stability of the insurance availability program and would assure all Kansans they would have a source of recovery for damages resulting from malpractice."

For an in-depth analysis see Reports of Special Committees to the 1976 Kansas Legislature re: Proposal No. 42—Medical Malpractice.

As noted in *State ex rel. Schneider v. Liggett,* the Fund is required to pay "[a]ny amount due from a judgment or settlement which is in excess of the basic coverage liability of all liable resident health care providers or resident self-insurers for any such injury or death arising out of the rendering of or the failure to render professional services within or without this state." K.S.A. 1983 Supp. 40-3403(*b*). (No change since statute passed in 1976.) Health care providers covered by the Act include "a person licensed to practice any branch of the healing arts by the state board of healing arts," and "a professional corporation organized pursuant to the professional corporation law of Kansas by persons who are authorized by such law to form such a

corporation and who are health care providers as defined by this subsection." K.S.A. 1983 Supp. 40-3401(*f*). (No change in these portions of the statute since statute passed in 1976.)

The Act classifies both the doctor and the professional corporation as health care providers. The Corporation argues the legislature did not intend for both a doctor and his or her professional corporation be liable to a patient for the same occurrence. The Corporation claims if both the doctor and the professional corporation are liable for the same occurrence, premium costs of medical malpractice insurance will be increased, thereby defeating the purpose of the Act.

Physicians who are shareholders or employed by a professional corporation are required by the Act to obtain basic liability coverage the same as other physicians who are not shareholders or employees of a professional corporation. The Corporation claims professional corporations classified as health care providers are required to have malpractice insurance to protect patients where nurses or medical technicians employed by that professional corporation are negligent.

The laws of this state contain broad general provisions authorizing the organization of corporations for any lawful business purpose. K.S.A. 17-6001(*b*). Other statutes permit persons engaged in certain professions, when licensed to practice that profession, to form corporations for the practice of their profession. K.S.A. 17-2707.

A professional corporation is subject to the general laws of Kansas relating to corporations except that any provision of the professional corporation law shall take precedence over any provision of the general corporation law where they conflict. K.S.A. 17-2708. There is no conflict between general laws governing corporations and professional corporation laws in this case; therefore, the general corporation law controls.

Professional liability insurance is required to be maintained by all health care providers as a condition to rendering services in the state. K.S.A. 40-3402 provides in part:

"(*a*) A policy of professional liability insurance approved by the commissioner and issued by an insurer duly authorized to transact business in this state in which the limit of the insurer's liability is not less than one hundred thousand dollars ($100,000) per occurrence, subject to not less than a three hundred thousand dollar ($300,000) annual aggregate for all claims made during the policy period, shall be maintained in effect by each resident health care provider as a

condition to rendering professional service as a health care provider in this state, unless such health care provider is a self-insurer."

K.S.A. 1983 Supp. 40-3401(f) defines both Dr. Sifers, a person licensed to practice a branch of the healing arts, and the Corporation as a "health care provider." Each health care provider is required by statute to maintain professional liability insurance.

K.S.A. 1983 Supp. 40-3403 provides for the establishment of a fund to pay any amount due from a judgment or settlement in excess of the basic coverage of all liable health care providers. It states in part:

"(a) For the purpose of paying damages for personal injury or death arising out of the rendering of or the failure to render professional services by a health care provider, self-insurer or inactive health care provider subsequent to the time that such health care provider or self-insurer has qualified for coverage under the provisions of this act, there is hereby established the health care stabilization fund. The fund shall be held in trust in a segregated fund in the state treasury. The commissioner shall administer the fund or contract for the administration of the fund with an insurance company authorized to do business in this state.

"(b) Subject to subsection (e), the fund shall be liable to pay: (1) Any amount due from a judgment or settlement which is in *excess of the basic coverage liability of all liable resident health care providers* or resident self-insurers for any such injury or death arising out of the rendering of or the failure to render professional services within or without this state  .  .  .  ." Emphasis supplied.

The Fund must pay any amount of a judgment or settlement in excess of the basic coverage liability of all liable resident health care providers or resident self-insurers.

The basic coverage required for a health care provider is set forth in K.S.A. 40-3408 which states in part:

"The insurer of a health care provider covered by the fund or self-insurer shall be liable only for the first one hundred thousand dollars ($100,000) of a claim for personal injury or death arising out of the rendering of or the failure to render professional services by such health care provider, subject to an annual aggregate of three hundred thousand dollars ($300,000) for all such claims against the health care provider. However, if any liability insurance in excess of such amounts is applicable to any claim or would be applicable in the absence of this act, any payments from the fund shall be excess over such amounts paid, payable or that would have been payable in the absence of this act."

The Corporation claims even though there are two health care providers, Dr. Sifers and the Corporation, each required to maintain professional liability insurance, only Dr. Sifers' insurer is liable for the first $100,000.00 of the plaintiff's claim.

The Corporation makes two arguments why corporations are

not liable for negligent acts of doctors who are shareholders or employees. Both arguments are based on legislative intent, and cite no authority or legislative history to support them.

Defendants first argue because professional corporations were not included in the original definition of health care provider, the legislature must have intended that doctors and their professional corporations were to be treated independently, thus vitiating the vicarious liability between them. This line of reasoning is without merit and cannot be supported by examining the legislative history of Senate Bill No. 646 (L. 1976, ch. 231). Senate Bill No. 646 was changed four times during its legislative course. When examining those changes one finds that the groups included in the definition of health care provider changed with each draft. Some groups were added to the definition while others were deleted. The reason for changes was not that the legislature was considering the doctrine of respondeat superior or issues of liability between parties. It was for the reason the respective groups asked to be included or excluded from the Act. This is recognized by this court in *Liggett*, 223 Kan. at 612, where we noted that nurses and dentists were exempted from the Act because they asked to be exempted, while pharmacists were included in the Act because they asked to be included.

The legislature included professional corporations in the bill for the same reason it included pharmacists, that is because it was asked to include professional corporations in the Act. Professional corporations were added to Senate Bill No. 646 in conference committees after the bill had already been through two Senate committees and one House committee. Since the relevant language was added to the bill in conference committee, it is difficult to establish with any degree of certainty why it was added. The reason the legislature was concerned was that it knew professional corporations could be liable for their doctor stockholders' and doctor employees' negligent acts through respondeat superior and it wanted corporations to have the limited protection provided by the Act. This is the only logical explanation of why corporations were included. There is no question that the doctrine of respondeat superior was applicable to doctors and their corporations in Kansas at the time of enactment. See *Jacobson v. Parrill*, 186 Kan. 467, 472, 351 P.2d 194 (1960).

So, instead of abrogating the doctrine of respondeat superior as

appellant contends, the professional corporations were added as health care providers to protect the professional corporations from unlimited exposure. If this was not the underlying intent of the legislature, it most certainly has had that effect because all professional corporations of doctors in Kansas now have professional liability policies and these policies cover their employee doctors.

In their second argument, appellants contend because doctors and corporations are both defined as health care providers and are required to carry the basic coverage limits, the doctrine of respondeat superior is inapplicable. There must be a showing of independent fault on the parts of the doctor and the professional corporation before the professional corporation is liable. Or, in other words, appellants contend that the legislature changed the tort law of vicarious liability in Kansas by requiring both the doctors and professional corporations to have the coverage.

This court reviewed the doctrine of respondeat superior or vicarious liability as applied to corporations in *Kline v. Multi-Media Cablevision, Inc.*, 233 Kan. 988, 989, 666 P.2d 711 (1983):

"[A] corporation is liable for the torts of its agent when committed within the scope of the agent's authority and course of employment even though it did not authorize or ratify the tortious acts. [Citation omitted.] A related rule of law states a principal is responsible for the torts of its agent where the tortious acts are incidental to and in furtherance of the principal's business, even though outside the scope of the agent's authority."

The rationale for the doctrine of respondeat superior was stated in 53 Am. Jur. 2d, Master and Servant § 417 at p. 432:

"The doctrine of respondeat superior, under which liability is imposed upon the master for the acts of his servants committed in the course or within the scope of their employment, has its foundation or origin in consideration of public policy, convenience, and justice. It is elemental that every person in the management of his affairs shall so conduct them as not to cause an injury to another, and if he undertakes to manage his affairs through others, he remains bound so to manage them that third persons are not injured by any breach of legal duty on the part of such others while they are engaged upon his business and within the scope of their authority. 'The maxim of respondeat superior,' said Lord Chief Justice Best in Hall v. Smith, 'is bottomed on this principle: that he who expects to derive advantage from an act which is done by another for him must answer for any injury which a third person may sustain from it.' "

A professional corporation is subject to certain responsibilities when it is formed. Health care providers who incorporate may do so to gain certain advantages. They must also accept certain

liabilities, such as the application of the doctrine of respondeat superior. Such liability may result in greater care being taken by professional corporations when employing physicians.

There is no indication in the Act or in legislative committee reports or minutes indicating the legislature intended to abrogate the application of respondeat superior to professional corporations who are health care providers. K.S.A. 40-3402 requires each health care provider to maintain minimum malpractice insurance of $100,000.00 per occurrence and an annual aggregate of $300,000.00 for all claims made during the period. The Fund will pay the amount in excess of the basic coverage liability. K.S.A. 1983 Supp. 40-3403(b). The Act does not limit liability to $100,000.00 for all health care providers in any occurrence. It only limits each health care provider's liability to $100,000.00 for each occurrence. Several health care providers can be held liable in the same malpractice action. The Act's goal of limiting the cost of malpractice insurance may be still reached, although a professional corporate health care provider is subject to malpractice liability, for the reason its potential liability is restricted by the Act.

The legislature made these decisions based upon other considerations, not because it wanted to address vicarious liability of doctors and their corporations. If the legislature had intended to abrogate the doctrine of respondeat superior as to professional corporations, it could have and would have done so through the enactment of specific and definitive legislation. But, it did not do this. The reason why is that it did not consider abrogating this long-standing rule of law as to doctors and their professional corporations. Since the rule of respondeat superior was not changed as to doctors and professional corporations by the legislature in the Act, the rule is still applicable to Dr. Sifers and the Corporation. Therefore, the Corporation is responsible for the negligent act of its employee. As such, the trial court's ruling is correct and must be upheld.

Subsequent to the jury verdict of November 24, 1982, the trial court scheduled a hearing for December 8, 1982, to determine whether the separate award to the plaintiff on behalf of her husband should be reduced by the percentage of fault attributed to the plaintiff. After the hearing the issue was taken under advisement by the court. By Memorandum Decision dated and

filed January 4, 1983, the trial court ruled that any recovery for Terry McGuire pursuant to K.S.A. 23-205 should be reduced by the percentage of fault attributed to the plaintiff. The plaintiff cross-appealed from this decision. A Journal Entry of Judgment in the amount of $443,300.00 was signed by all parties and filed with the Clerk of the District Court of Johnson County, Kansas on January 5, 1983.

A Motion for New Trial or, in the Alternative, the Request for Remittitur was filed by defendants on January 17, 1983. On February 3, 1983, the trial court overruled both motions.

On February 4, 1983, the Fund mailed $243,300.00 to the Clerk of the District Court as full payment of its share of the judgment.

March 2, 1983, defendants filed a Notice of Appeal. Dr. Sifers filed a separate motion requesting the trial court issue an order to allow payment of $100,000.00 into court, to toll the interest on that portion of the judgment against Dr. Sifers. That motion was granted the same day. As a result, the Medical Protective Company, on behalf of Dr. Sifers, paid the amount of $100,000.00 into the Clerk of the District Court.

The Insurance Commissioner's motion to intervene, on behalf of the Fund, was granted April 6, 1983.

A motion was filed by plaintiff asking the court to fix a date from which interest should run on the judgment amount, and a hearing was duly held on March 11, 1983. The trial court ruled that since less than the total amount had been tendered to the Clerk of the District Court, the statutory interest rate of 15% should run on the total amount of the judgment of $443,330.00, even though $343,300.00 had previously been paid into court. The trial court further ruled that the statutory interest rate of 15% should attach to the judgment as of the date of the jury verdict of November 24, 1982, as opposed to the date the journal entry of judgment was filed, January 5, 1983.

The defendants and the Insurance Commissioner raise two questions concerning postjudgment interest.

First, the defendants and the Insurance Commissioner contend postjudgment interest should run from January 5, 1983, the day the journal entry was filed, not from the November 4, 1982, date the verdict was returned by the jury. The parties complain the trial court erred when it ordered postjudgment interest to run from the date of the verdict.

Plaintiff cites *Reel v. Kress & Co.,* 192 Kan. 525, 389 P.2d 831 (1964); *Degnan v. Young Bros. Cattle Co.,* 152 Kan. 250, 103 P.2d 918 (1940); *Koontz v. Weide,* 111 Kan. 709, 208 Pac. 651 (1922). All cases cited by the plaintiff predate the 1976 amendment of K.S.A. 60-258.

K.S.A. 1983 Supp. 16-204(*c*) provides:

"Any judgment rendered by a court of this state on or after July 1, 1982, shall bear interest on and after the day on which the judgment is rendered, at the rate of 15% per annum."

In *State v. Dubish,* 234 Kan. 708, 714, 675 P.2d 877 (1984), the court stated:

"K.S.A. 60-258 was amended in 1976, and now provides:

" 'Entry of judgments [shall] be subject to the provisions of section 60-254(*b*). No judgment shall be effective unless and until a journal entry or judgment form is signed by the trial judge and filed with the clerk of the court.  .  .  .

" 'When judgment is entered by judgment form the clerk shall serve a copy of the judgment form on all attorneys of record within three days. Service may be made personally or by mail. Failure of service of a copy of the judgment form shall not affect the validity of the judgment.'

"The new statute's language is clear. No judgment is effective unless and until a journal entry or judgment form is signed by the trial judge and filed with the clerk of the court. *In re Estate of Burns,* 227 Kan. 573, 575, 608 P.2d 942 (1980)."

Under the present statute, there is no judgment rendered for interest to commence until a journal entry or judgment form is signed by the trial judge and filed with the clerk of the court. See 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-258 (1979).

Where there is more than one claim for relief or multiple parties K.S.A. 60-258 states entry of judgment shall be subject to the provisions of K.S.A. 60-254(*b*), which provides:

"When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties."

Plaintiff argues all issues were resolved on Count I, the claim for

her own injuries, when the verdict was returned by the jury; unresolved issues remained only on Count II, the claim for loss of consortium, and therefore, postjudgment interest should run on Count I from the date the verdict was returned. This is incorrect. A final judgment of one or more of the claims in a lawsuit pursuant to K.S.A. 60-254(*b*), to be effective, must follow the filing requirements of K.S.A. 60-258. Without a journal entry or judgment form as prescribed by K.S.A. 60-258, there was no judgment on any issue. It is error to allow interest on a verdict for unliquidated damages for the time between its finding and rendition of the judgment thereon. *Milling Co. v. Buoy,* 71 Kan. 293, Syl. ¶ 3, 80 Pac. 591 (1905).

The plaintiff claims losing parties by delaying the entry of judgment are capable of denying the prevailing party interest it is entitled to receive. In most cases a journal entry can be filed, finalizing judgment, shortly after trial. Trial courts should prevent intentional delay of the entry of judgment by filing a judgment form or requiring that a journal entry be signed and filed with the clerk of the court as soon as possible.

Second, the defendants' and the Insurance Commissioner's claim is that the trial court erred in ruling postjudgment interest should run on the $443,300.00 judgment although $343,300.00 was paid to the clerk of the district court. The Insurance Commissioner on behalf of the Health Care Stabilization Fund paid $243,300.00 into court and Dr. Sifers' insurer paid $100,000.00 into court.

In *Schaefer & Associates v. Schirmer,* 3 Kan. App. 2d 114, 119-20, 590 P.2d 1087 (1979), Judge Spencer wrote:

"If the judgment debtor wishes to avoid the accrual of interest on appeal, he must *tender* the amount of the judgment or pay the amount into court. [Citations omitted.]

"The trial court offered plaintiff the opportunity to avoid the accrual of interest on appeal by making payment into court, with appropriate orders directing that such would not constitute an acquiescence. Plaintiff did not avail itself of that opportunity. Under our statute, interest on the judgment must therefore continue to accrue until it is paid." Emphasis supplied.

In *Bartlett v. Heersche,* 209 Kan. 369, Syl. ¶ 2, 496 P.2d 1314 (1972), this court stated:

"Once a judgment debtor pays the full amount of money payable on a judgment into court, interest is not recoverable on the monies deposited in court."

Neither *Bartlett* nor *Schaefer* addresses the question of whether partial payment of a judgment tolls postjudgment interest on the portion paid into court, but the language used in the opinions suggests a judgment debtor must pay the full amount of the judgment into court to toll postjudgment interest. In *Schaefer* the word "tender" is utilized. This court stated in *Carpenter v. Riley*, 234 Kan. 758, Syl. ¶ 1, 675 P.2d 900 (1984):

"Tender is an unconditional offer to perform a condition or obligation. The party making tender must have the ability for immediate performance. The tender must be absolute and unconditional to be effectual."

47 C.J.S., Interest & Usury § 62, pp.148-50 states:

"To suspend the accrual of interest on a debt, a tender must be in the full amount owed by the debtor, as adjudicated by the trial court, or on appeal, regardless of whether the tender is made before or after the bringing of a suit. Accordingly, this rule is applicable to tenders made before bringing suit, or during litigation, or after judgment, and pending appeal.

"The accrual of interest on a debt is not generally suspended by the tender in an amount less than the amount due, and the fact that there is a bona fide dispute as to the amount of the indebtedness is no bar to granting of interest if the amount offered falls short of the amount found to be due. Thus, a tender of the principal amount of an indebtedness may not stop the accrual of interest thereon where it does not include accrued interest, costs, or attorney fees.  . . .

"A partial payment of a judgment into court, however, may stop the accrual of interest on that part of the judgment that has been satisfied, if it is a legally sufficient tender and can be treated as a partial payment, and if the clerk of the court is directed to apply the partial payment to the reduction of the amount of the judgment."

Dr. Sifers' insurer and the intervenor Insurance Commissioner did not intend their payment into court to be a partial payment of their portion of the judgment. Their intent was to fully pay the portion of the judgment for which they were responsible to the plaintiff, thereby tolling the statutory rate of interest pending appeal.

The defendants and the intervenor argue the plaintiff is receiving an unfair windfall because she is receiving statutory postjudgment interest at a 15% interest rate and close to 9% interest on the funds already paid into court. To hold that the accrual of interest was not tolled will unjustly enrich the plaintiff who is receiving interest on the money already paid plus, under the trial court's order, statutory interest of 15% on the entire judgment until paid.

47 C.J.S., Interest & Usury § 23, p. 69, contains this statement:

"The allowance of interest on a judgment, under the statutes, is not a measure of damages, but a compensation fixed by law for the purpose of indemnifying the judgment creditor for the nonpayment of the liquidated claim and the loss of the use of his money, although the interest has been held to be a legal incident of the judgment, and a distinct substantive part of the debt."

We have determined the professional corporation's insurer was responsible for its employee's, Dr. Sifers, negligent acts while treating the plaintiff. The Corporation's insurer, as a health care provider, was subject to liability not to exceed $100,000.00 for its employee's negligent act notwithstanding that the employee, Dr. Sifers, also a health care provider, was required to pay $100,000.00. Therefore, Dr. Sifers' insurer and the Fund have paid into court the full amount of the judgments against them. The remaining unpaid portion of the judgment ($100,000.00) was the responsibility of the professional corporation's insurer. Payment by Dr. Sifers' insurer and the Insurance Commissioner for the Fund was an unconditional tender of the full amount they owed. There was no partial payment of the judgment against Dr. Sifers' insurer and the Fund. The professional corporation, having failed to pay its proper portion of the judgment, owes the remaining $100,000.00, at the legal rate of interest allowed by law from the date the journal entry was filed with the clerk of the court.

The plaintiff cross-appeals from the trial court's ruling that the award for the plaintiff's loss of consortium claim be reduced by the comparative fault attributed to the plaintiff. The question is one of first impression.

Loss of consortium actions are brought pursuant to K.S.A. 23-205, which provides:

"Where, through the wrong of another, a married person shall sustain personal injuries causing the loss or impairment of his or her ability to perform services, *the right of action to recover damages for such loss or impairment shall vest solely in such person,* and any recovery therefor, so far as it is based upon the loss or impairment of his or her ability to perform services in the household and in the discharge of his or her domestic duties, shall be for the benefit of such person's spouse so far as he or she shall be entitled thereto. Nothing herein shall in any way affect the right of the spouse to recover damages for the wrongful death of his or her spouse." Emphasis supplied.

K.S.A. 60-258a(*a*), a portion of the comparative negligence statute, states:

"(*a*) The contributory negligence of any party in a civil action shall not bar such

party or said party's legal representative from recovering damages for negligence resulting in death, personal injury or property damage, if such party's negligence was less than the causal negligence of the party or parties against whom claim for recovery is made, *but the award of damages to any party in such action shall be diminished in proportion to the amount of negligence attributed to such party.* If any such party is claiming damages for a decedent's wrongful death, the negligence of the decedent, if any, shall be imputed to such party." Emphasis supplied.

The right to recover for loss of consortium vests in the spouse who files an action for personal injuries, not in the spouse who actually suffers the loss of consortium. K.S.A. 23-205. See *Cornett v. City of Neodesha,* 187 Kan. 60, 62, 353 P.2d 975 (1960). The award of damages for loss of consortium is to the plaintiff for the benefit of the spouse. K.S.A. 60-258a(*a*) requires the award for damages to any party shall be reduced by the amount of negligence attributed to such party. The language of our statutes requires the award for loss of consortium be reduced by the percentage of the injured spouse's fault. See also *Miles v. West,* 224 Kan. 284, 580 P.2d 876 (1978). The trial court was correct.

Affirmed in part and reversed in part.