No. 63,968 ■

OBSTETRICS & GYNECOLOGY LIMITED OF KANSAS CITY, INC., a Missouri Professional Corporation, Formerly Known as Knock, Buckner, Youngblood, Bickley & Zeller, Inc., a Missouri Professional Corporation, *Appellee*, and ST. PAUL FIRE AND MARINE COMPANY, a Minnesota Corporation, *Appellee/Cross-Appellant*, v. ROBERT C. BUCKNER, M.D., *Defendant*, and FLETCHER BELL, Commissioner of Insurance for the State of Kansas, *Appellant/Cross-Appellee*.

(795 P.2d 386)

Opinion filed July 13, 1990.

*Thomas V. Murray*, of Barber, Emerson, Springer, Zinn & Murray, of Lawrence, argued the cause and was on the briefs for appellant/cross-appellee Fletcher Bell.

*Thomas D. Billam*, of Wallace, Saunders, Austin, Brown, and Enochs, Chartered, of Overland Park, argued the cause and was on the brief for appellee/cross-appellant St. Paul Fire and Marine Company.

The opinion of the court was delivered by

MCFARLAND, J.: St. Paul Fire and Marine Company (St. Paul) paid $600,000 to settle a medical malpractice action in which two of its insureds, Dr. Robert Buckner and Obstetrics & Gynecology Limited of Kansas City, Inc., (Corporation) were named defend-

ants. Through this action, St. Paul is seeking to recoup $500,000 of the settlement from the Kansas Health Care Stabilization Fund (Fund). The district court granted judgment in favor of St. Paul in the amount of $400,000. Fletcher Bell, Commissioner of Insurance and administrator of the Fund, appeals from the judgment. St. Paul cross-appeals from the district court's denial of prejudgment interest and the $100,000 reduction of its claim.

The underlying facts must be set forth in considerable detail. The Corporation is incorporated as a professional corporation under the laws of Missouri. It is not a "health care provider" as defined by K.S.A. 1989 Supp. 40-3401(f) as it is not "a professional corporation organized pursuant to the professional corporation law of Kansas." The parties agree the Corporation is not subject to the Health Care Provider Insurance Availability Act, K.S.A. 40-3401 *et seq.* (the Act).

St. Paul issued a Physicians and Surgeons Professional Policy. The basic coverage stated:

"Who's protected:

INDIVIDUAL
Knoch, Kermit
Buckner, Robert C.
Bickley, James E.
Youngblood, James P.

ORGANIZATION
Drs. Knoch, Buckner, Youngblood & Bickley, Inc."

Limits of coverage were $100,000 each person with a total limit of $300,000. The premium paid was $22,980.

The following endorsement, in pertinent part, was a part of the policy:

"KANSAS NON-RESIDENT PHYSICIAN ENDORSEMENT

. . . .
"Drs. Knoch Buckner,
Youngblood & Bickley, Inc.

"What this endorsement does
"If you are a non-resident physician, this endorsement increases the limits of coverage for your Physician Professional Liability Protection. But the increased Limits shown below apply only to the providing or withholding of Limits of your coverage Professional services outside the State of KANSAS.
"The additional premium of $5,848.00 increase[s] your coverage to:

$1,000,000    each person
 1,000,000    total limit

"Who's protected

"This endorsement applies only to the following individuals or organizations:

  James P. Youngblood

  Drs. Knock, Buckner, Youngblood & Bickley, Inc.

"Other terms

"All other terms of your policy remain the same."

As noted in the case caption, the name of the professional corporation was changed to its present name after the issuance of the policy.

Appropriate notice of basic coverage was sent to Bell as to physicians Knock, Buckner, Bickley, and Schaeffer, who were health care providers within the definition of K.S.A. 1989 Supp. 40-3401(f), but not as to Youngblood or the Corporation, who were not subject to the Act. The business address of all physicians and the Corporation was listed as 1010 Carondelet Dr., Suite 328, Kansas City, Missouri 64114.

On December 11, 1977, Dr. Buckner delivered a baby, Christine Loetel, at St. Mary's Hospital in Kansas City, Missouri. On July 6, 1982, a lawsuit was filed in Missouri on behalf of the child by her mother, Pamela J. Loetel, as mother and next friend, alleging that the delivery had been negligently performed and that Christine had been damaged as a result thereof. Dr. Buckner was a named defendant as was the Corporation on the basis of the doctrine of respondeat superior, Dr. Buckner being an employee of the Corporation.

St. Paul defended the action on behalf of its two insureds. Demand was made upon Bell by St. Paul for participation. A basic disagreement developed as to the respective obligation of the Fund and the policy of insurance. St. Paul contended the Fund had liability for any amount over $100,000. Bell contended St. Paul's liability extended to the first $1,100,000 of the claim. St. Paul ultimately settled the Loetel action for $600,000 on behalf of its two insureds. In its bookkeeping, St. Paul attributed $100,000 to Buckner's coverage and $500,000 to the Corporation's coverage. There is no contention the $600,000 settlement was unreasonable in amount.

St. Paul wanted to force the Fund to reimburse it for the $500,000 it believed it had been compelled to pay by Bell's

wrongful refusal to participate. However, there was an impediment to the pursuit of the claim. There was no judgment against Buckner for $600,000. The settlement had been paid on behalf of Buckner *and* the Corporation, who were each insureds under the policy, and the settlement was within the total coverage afforded. St. Paul developed a strategy to overcome the impediment and achieve its goal. On November 18, 1986, an action was filed in the United States District Court for the District of Kansas (Civil Action No. 86-2516-0) wherein St. Paul and the Corporation (in cooperation with St. Paul) sought the following: Count I:

A judgment against Buckner for $500,000 based upon a theory of indemnity. More specifically, it was claimed that as the Corporation's liability was based upon the negligence of Buckner, its employee, through the doctrine of respondeat superior, indemnity by Buckner was appropriate; and

Count II:

A judgment against Bell in the amount of $500,000 on the basis the Fund was to pay any judgment or settlement against Buckner in any amount in excess of the basic coverage amount of $100,000. St. Paul had previously entered into an agreement with Buckner and the Corporation whereby St. Paul: (1) would pay all attorney fees incurred by Buckner and the Corporation arising from this new action, and (2) would not execute against Buckner on any judgment rendered therein. Buckner filed a cross-claim against Bell for indemnification as to any judgment entered against him. St. Paul then had two avenues of recovery open. If St. Paul obtained a judgment against Buckner, then Buckner would be seeking payment of the amount from the Fund. Additionally, in Count II, it had the direct action against Bell based upon the Buckner judgment. For undisclosed reasons, by mutual agreement, the federal action was dismissed and an identical action, including the cross-claim, was filed in the District Court of Shawnee County. This is the action before us.

We turn now to what transpired in the district court. Volleys of summary judgment motions were fired: (1) by plaintiffs against Buckner on Count I; (2) by plaintiffs against Bell on Count II; (3) by Bell against plaintiffs on Count II; (4) by Bell against

Buckner on the latter's cross-claim; and (5) by Buckner against Bell on the cross-claim.

Highly summarized, the district court held that:

(1) resolution of the issues did not require that there be a judgment entered against Buckner individually herein;

(2) St. Paul could proceed directly against Bell to recoup monies which Bell had wrongfully compelled St. Paul to pay;

(3) Buckner and the Corporation each had $100,000 of applicable basic coverage;

(4) the endorsement to the policy had no applicability in the determination of the Fund's liability;

(5) the Fund was obligated to reimburse St. Paul in the amount of $400,000; and

(6) prejudgment interest was not authorized against the Fund. The summary judgment motions were, accordingly, disposed of as follows: (1) Bell's motion as to Count II was denied; (2) plaintiff's motion as to Count II was granted in the reduced amount of $400,000 but denied as to the requested allowance of prejudgment interest; (3) the other three motions (Buckner's motions as to Count I and his cross-claim and Bell's motion as to the cross-claim) were denied as being moot.

The ultimate issue before us is easily stated. That is, does the Fund's coverage herein commence at the $100,000 Buckner basic policy level as claimed by St. Paul, or at the $1,100,000 aggregate level of the policy as claimed by Bell? The difficulty lies in reducing the ultimate issue into sub-issues as St. Paul and Bell rely on different theories and statutes as well as divergent public policy arguments. The confusion is increased by the fact that the district court added the Corporation's basic policy $100,000 coverage to that of Buckner's (thereby reducing the claimed recoupment to $400,000), which is inconsistent with anything argued by either party. Except for the clear-cut issue as to the failure of the district court to allow prejudgment interest, the rest of the case comes before us in a rather messy plait of overlapping and interlocking arguments with a goodly supply of stray hairs.

A logical starting point for our discussion is the Health Care Provider Insurance Availability Act (K.S.A. 40-3401 *et seq.*). In

*State ex rel. Schneider v. Liggett*, 223 Kan. 610, 576 P.2d 221 (1978), we stated:

"The Kansas Health Care Provider Insurance Availability Act was passed by the 1976 legislature as a partial response to increasing pressure brought upon Kansas health care providers because of the national medical malpractice crisis. The primary feature of the act is the requirement that all health care providers operating within the state must obtain professional malpractice liability insurance (40-3402) and pay a surcharge to the health care stabilization fund (40-3404). The law requires the provider to carry a basic policy of $100,000 per occurrence and an annual aggregate of $300,000 for all claims made during the period. The stabilization fund provides for the payment of claims in excess of policy limits. Included in the act is a provision requiring every health care insurer to participate in an apportionment plan whereby any health care provider may obtain liability insurance from the plan if insurance from a conventional source (40-3413) is not available." 233 Kan. at 611.

K.S.A. 40-3408 provides:

"The insurer of a health care provider covered by the fund or self-insurer shall be liable only for the first $200,000 of a claim for personal injury or death arising out of the rendering of or the failure to render professional services by such health care provider, subject to an annual aggregate of $600,000 for all such claims against the health care provider. However, if any liability insurance in excess of such amounts is applicable to any claim or would be applicable in the absence of this act, any payments from the fund shall be excess over such amounts paid, payable or that would have been payable in the absence of this act. The liability of an insurer for claims made prior to July 1, 1984, shall not exceed those limits of insurance provided by such policy prior to July 1, 1984."

Note: The claim herein was made prior to July 1, 1984, and, hence, the earlier, lower limits of $100,000/$300,000 apply.

In *McGuire v. Sifers*, 235 Kan. 368, 681 P.2d 1025 (1984), we held that where a physician and the professional corporation are both health care providers under the Act, and each is required to maintain the specified insurance, the Fund's coverage is excess to the combined policy coverage of the two health care providers. The corporation's liability in *McGuire*, as in the case before us, was based upon respondeat superior.

It should, perhaps, be noted that in 1986 the legislature amended K.S.A. 40-3408 to add:

"Notwithstanding anything herein to the contrary, an insurer that provides coverage to a health care provider may exclude from coverage any liability incurred by such provider from the rendering of or the failure to render

professional services by any other health care provider who is required by K.S.A. 40-3402 and amendments thereto to maintain professional liability insurance in effect as a condition to rendering professional services as a health care provider in this state." L. 1986, ch. 229, § 30.

This amendment made an effective alteration to *McGuire* but the amendment occurred after the time period involved herein.

The district court held that *McGuire* was not determinative as the Corporation herein is not a Kansas health care provider. It is true *McGuire* involved two health care providers under the Act and reference is made to the Act's requirements. It is also true, however, that *McGuire* relies, in part, upon general corporation law for its resolution of the issue. Further, *McGuire* specifically refers to K.S.A. 40-3408 in the form applicable then (and to the claim herein) as follows:

" 'The insurer of a health care provider covered by the fund or self-insurer shall be liable only for the first one hundred thousand dollars ($100,000) of a claim for personal injury or death arising out of the rendering of or the failure to render professional services by such health care provider, subject to an annual aggregate of three hundred thousand dollars ($300,000) for all such claims against the health care provider. *However, if any liability insurance in excess of such amounts is applicable to any claim or would be applicable in the absence of this act, any payments from the fund shall be excess over such amounts paid, payable or that would have been payable in the absence of this act.' "* 235 Kan. at 376 (quoting K.S.A. 40-3408) (Emphasis supplied.).

Bell contends that the emphasized portion of K.S.A. 40-3408 is determinative herein. The argument has merit.

The lengthy and complex history of this litigation has cloaked it with considerable foliage. When the leaves are stripped away, the basic nature of the controversy becomes clear.

Five physicians are owners of the Corporation. The business of the Corporation relies basically on the practice of medicine by its employee-shareholder-physicians. The physicians are engaged in a medical speciality with high exposure to medical malpractice litigation—obstetrics and gynecology. All of the five physicians practice their profession in the State of Missouri. This is where their offices and professional corporation (incorporated under the laws of Missouri) are located. Four of the five physicians reside in Kansas and are licensed to practice in Kansas and Missouri—

hence, they come within the purview of the Act. The fifth physician (Youngblood) and the Corporation are not within the Act.

All five physicians have a genuine economic interest in maintaining adequate insurance to protect their personal assets, as well as those of their corporation, from litigation expense and the payment of malpractice judgments or settlements. An insurance policy was purchased from St. Paul which was obviously intended to provide such coverage. Each of the five physicians and the Corporation acquired the basic $100,000/$300,000 coverage which was the amount required by the Act. The four physicians covered by the Act could rely on the Fund for excess coverage beyond the $100,000 claim limit. Youngblood and the Corporation had no Fund coverage and, therefore, $900,000 of additional coverage was purchased for them through the endorsement.

The Loetel claim arose from the practice of medicine in Missouri and was, accordingly, filed in a Missouri court. Dr. Buckner and the Corporation were named codefendants, the latter on the basis of respondeat superior as the employer of Buckner. St. Paul defended both of its insureds as required by the policy. Had the Loetel case gone to trial and judgment, any of plaintiff's judgment would have been a joint judgment against the two insureds. There is no question but that St. Paul had a $1,100,000 exposure in the Loetel claim. It had a duty to act in good faith in settlement negotiations. When the opportunity to settle within the policy limit surfaced, Bell warned St. Paul that he believed there was a good possibility that a judgment could exceed the policy limits, thereby opening the door to a later claim of bad faith and a possible exposure of St. Paul for payment of a judgment in excess of the policy limits. St. Paul and the district court designate this as coercion by Bell. Actually, the risk to St. Paul was not dependent on the Fund's applicability. The risk would arise from bad faith shown by St. Paul to its insureds.

St. Paul settled the Loetel claim for $600,000. St. Paul acknowledges $100,000 was paid by it under Buckner's coverage and $500,000 on the Corporation's coverage. Such payment was within the coverage limits of the respective insureds.

In this action, St. Paul is attempting to shift the $500,000 it paid under the Corporation's coverage to Buckner in an artificial claim that he should, as an employee of the Corporation, indem-

nify the Corporation for sums it (through its insurance carrier) had to pay as a result of the employee's negligence. That St. Paul had secured the cooperation of the Corporation and Buckner in this orchestrated action is amply demonstrated by the pre-litigation agreements wherein St. Paul promised to pay its insureds' cost of litigation and never to execute against Buckner personally for any judgment rendered against him. That such prior agreements were made is not surprising. The Corporation's coverage was purchased by the owners to protect their respective personal and corporate interests. They certainly would not contemplate that they could be held personally liable for indemnification on any sums paid to claimants under the corporate coverage. Indeed, it would be difficult to conceive of anything St. Paul could do that would have a greater chilling effect on its future sales of medical malpractice insurance than the type of litigation against Buckner before us if it were "for real." Clearly, the claim against Buckner is intended to serve only as a conduit to the Fund.

There is authority for the proposition that it is impermissible for an insurance carrier insuring both a physician and his professional corporation in a medical malpractice policy to pursue the negligent physician for indemnification for sums paid on behalf of the corporation. Illustrative thereof is *Continental Cas. Co. v. Empire Cas. Co.*, 713 P.2d 384 (Colo. App. 1985), *aff'd in part, rev'd in part on other grounds Empire Cas. Co. v. St. Paul Fire & Marine*, 764 P.2d 1191 (Colo. 1988), where it was held:

"An insurer cannot subrogate against its own insured to assert the indemnification claim of its named insured. [Citation omitted.] This is so because, by definition, subrogation exists only with respect to rights of the insurer against third persons to whom the insurer owes no duty. [Citation omitted.] An insurance company has no subrogation rights against the negligence of its own insured. [Citation omitted.] To allow subrogation under such circumstances would permit an insurer, in effect, to pass the incidence of the loss, either partially or totally, from itself to its own insured, and thus avoid the coverage which its insured purchased. [Citation omitted.]" 713 P.2d at 394.

We need not decide this particular point, however, as no judgment was entered herein on St. Paul's claim against Buckner (Count I).

After careful consideration, we conclude that K.S.A. 40-3408 is controlling, specifically that portion which provides:

"[I]f any liability insurance in excess of such amounts is applicable to any claim or would be applicable in the absence of this act, any payments from the fund shall be excess over such amounts paid, payable or that would have been payable in the absence of this act."

The policy before us was purchased to provide coverage for claims such as that made by Loetel and did, in fact, provide such coverage.

The 1986 amendment to K.S.A. 40-3408 which permits a carrier to exclude vicarious liability coverage of one health care provider from liability for the actions of another is inapplicable as: (1) the corporation is not a health care provider within the Act; (2) the policy does not contain the exclusion; and (3) the amendment occurred after the pertinent dates involved herein.

There is also a strong public policy argument in support of our resolution herein. The Corporation, unlike a professional corporation under the Act, did not pay the premium surcharge required by the Act to provide monies for the Fund. A contrary holding would give the Corporation a free ride on the Fund which is certainly not within the legislative intent of the Act. The claim herein arose through Buckner's practice of medicine in Missouri within his Missouri professional corporation. The fact that Buckner chose to reside in Kansas does not permit the issuer of the medical malpractice policy covering both Buckner and the Corporation for claims such as this to shift the Corporation's liability under Missouri law and the policy to the Fund. St. Paul paid $100,000 on behalf of Buckner and $500,000 on behalf of the Corporation, who were codefendants in the Loetel action and were insureds under the policy. Such settlement was within the policy limits applicable to each of the insureds. We find no legal basis herein for shifting the payment made by St. Paul on behalf of the Missouri Corporation to the Fund.

We conclude the summary judgment entered against Bell must be reversed. This renders all other issues moot.

The judgment is reversed.

SIX, J., not participating.